IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-03098-MEH

KRIS OLSON,

    Plaintiff,

v.

PENSKE LOGISTICS, LLC,

    Defendant.

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

**Michael E. Hegarty, United States Magistrate Judge**.

Before the Court are Plaintiff's Motion for Summary Judgment as to Liability [filed July 23, 2015; docket #43] and Defendant's Motion for Summary Judgment [filed July 31, 2015; docket #44]. The motions are fully briefed, and the Court finds that oral argument will not assist in its adjudication of the motions. Based on the record herein and for the reasons that follow, the Court denies the Plaintiff's motion and grants in part and denies as moot in part the Defendant's motion.[1]

## BACKGROUND

### I. Procedural History

Plaintiff Kris Olson ("Olson") initiated this action against Defendant Penske Logistics, LLC ("Penske") in Denver County District Court on October 28, 2014. Docket #1-1. Penske removed the action to this Court on November 17, 2014 asserting the Court's federal question jurisdiction.

---

[1] Pursuant to 28 U.S.C. § 636(c) and the Pilot Program to Implement the Direct Assignment of Civil Cases to Full Time Magistrate Judges, the parties consented to the jurisdiction of this Court to conduct all proceedings in this civil action. Docket #24.

Docket #1. Olson filed an Amended Complaint as a matter of right pursuant to Fed. R. Civ. P. 15(a) on December 5, 2014 asserting one claim alleging that Penske interfered with his rights under the Family Medical Leave Act ("FMLA") when Penske terminated his employment during an approved FMLA leave. Amended Complaint, docket #21. Penske timely filed an Answer on December 19, 2014 essentially denying Olson's allegations. Docket #22.

The Court held a Scheduling Conference on January 5, 2015 at which the Court set deadlines for discovery and the filing of dispositive motions, as well as dates for pretrial conferences and the jury trial. Dockets ## 26, 27. Discovery proceeded and on July 23, 2015, Olson filed the present motion for summary judgment arguing no triable issues exist as to whether Penske interfered with his FMLA rights. *See* docket #43. Penske responded that the FMLA is not a strict liability statute and that it may terminate an employee if "the dismissal would have occurred without regard to a request for or taking of FMLA leave." Docket #46. Penske also filed the present cross motion for summary judgment contending it has "copious undisputed evidence" showing that "Olson was terminated because his unsatisfactory performance had reached an intolerable level." Docket #44. Olson counters that Penske's termination reasons are a pretext for its motivation to terminate Olson for taking FMLA leave. Docket #45.

**II.     Findings of Fact**

Following review of the cross motions for summary judgment and the supporting papers attached, the Court finds that there is no dispute concerning the following statement of facts.

1.      Olson worked for Penske for over twelve years. He was promoted several times during his

tenure with Penske.[2]

2.      Penske warehouses Whirlpool products under specified contract terms.

3.      Olson was the Operations Manager for Penske's Aurora regional distribution center ("RDC")[3] for approximately three to four years prior to his termination. The Operations Manager was responsible for "everything that went on within the four walls" of the Aurora RDC, including financials, personnel, inventory, and safety. For example, Olson's responsibilities included enforcing Penske's personnel policies for all Aurora RDC associates; enforcing the attendance policy and ensuring attendance records were kept accurately; ensuring that associates met Penske's and Whirlpool's performance standards, including aisle audits, inventory, random audits, and proper identification of inventory stows; making sure there were no "ghost or fictitious stows" being used; and training employees.

4.      In addition, Olson was responsible for ensuring that Penske met contract requirements at the Aurora RDC. If the Aurora RDC did not meet the standards specified in the Whirlpool contract, Whirlpool could terminate the entire Penske contract.

5.      Olson's supervisor was Rick Elliot, who was Penske's Senior Operations Manager.

6.      A written review of Olson's job performance from January 2014 reflects that Elliott rated Olson as "satisfactory" and awarded Olson a bonus and a salary raise.

7.      On June 11, 2014, Elliott responded by email to Olson's message concerning "lift support needed." Emails between Olson and Elliott dated June 10-11, 2014, docket #43-6. Elliott suggested locations from which Olson might obtain extra lift operators and instructed Olson, "Pull Andrew and

---

[2]Unless citations are otherwise noted, the parties have stipulated to these facts. *See* dockets ##46, 47.

[3]The parties also refer to the Aurora RDC as the Aurora warehouse or Denver warehouse.

3

Tom in and start thinking of what else you can do. Maybe you skip cycle counts or reduce them. Start thinking through this. ... Once you guys have had a chance to think this through call me in the morning and advise. What happens in the next 3 weeks is critical." *Id.*

8. On June 16, 2014, Elliott placed Olson on a 60-day Performance Improvement Plan ("PIP"), in which Elliott counseled Olson to correct the following deficiencies: (1) failure to provide adequate staffing to meet operational requirements, (2) low velocity inbound, and (3) lack of urgency in responding. 60-Day Action Plan, docket #43-7.

9. The following month, Elliott informed Olson he had met all expectations under the PIP saying, "At this time you have been meeting all of the requirements of your action plan. Please continue that kind of performance and you will succeed." Email from Elliott to Olson, July 3, 2014, docket #43-8.

10. On or about July 10, 2014, Olson requested permission from Penske to take a medical leave of absence. Email to Carol Prendershot, docket #43-9.

11. On July 18, 2014, Elliott received from the Aurora RDC an "Inventory June Top Sheet Report from Whirlpool," which graded the warehouse a "D" on a scale of A-F for monthly inventory performance. Penske Field Investigation Template, docket #44-4 at 14-15.

12. Olson took vacation leave during the week of July 21, 2014. Deposition of Rick Elliott, June 11, 2015 ("Elliott Depo"), 34: 19-23, docket #43-2.

13. On July 24, 2014, FMLASource, a third-party vendor working with Penske, addressed a letter to Olson notifying him that his medical leave of absence from July 28, 2014 through October 19, 2014 was approved and protected by the FMLA. Letter from FMLASource to Olson, docket #43-10. Accordingly, Olson commenced his FMLA leave on July 28, 2014.

14.     On August 1, 2014, Elliott notified Penske Human Resources ("HR") that he wanted to terminate Olson based on a Field Investigation Template ("FIT") he had completed regarding Olson's "failure to follow standard inventory control and security processes." Email from Elliott to Perry and Scribner with attached FIT, docket #44-4 at 12-15. Elliott noted that, after receiving the "Inventory June Top Sheet Report from Whirlpool" that graded the Aurora RDC a "D" for monthly inventory performance, Elliott retained another employee, Nicky Brurs, during Olson's absence "to assist in management of the location and research the inventory to get the performance turned around." *Id.* at 14. Brurs reported to Elliott a number of problems Brurs found with the warehouse's inventory management and reporting, which led Elliott to determine Olson had violated Penske's "Policy 2-10.6 Basic Standards of Conduct." *Id.* at 15; *see also* Email from Brurs to Elliott, docket #44-5 at 4-5.

15.     Olson had under his supervision an "inventory person" who was responsible for "going out and verifying the inventory [what Penske was supposed to have and what it actually had] for [a] particular model number" (Elliott Depo, 27: 11-18), then reporting her findings to Olson (*id.*, 38: 12-16). The inventory person working for Olson had been missing from work two or three days before Olson went on leave, then quit the same day Olson left. *Id.*, 38: 1-9.

16.     On August 5, 2014 Penske wrote off $41,888 in inventory losses based on Brurs' findings. Declaration of Rick Elliott, July 30, 2015, ¶ 16, docket #44-4.

17.     On August 12, 2014, after learning from another Penske employee that she had not heard from Olson "to be put out on medical LOA or [sic] there isn't even a claim started thru [sic] Prudential," Penske Human Resources representative, Vanessa Perry, informed Elliott and Bruce Gruebner, Director of Field HR, that Olson was "out on an unapproved leave." Email from Perry,

docket #44-3 at 7-8.

18. Penske's Loss Prevention department for Denver Operations conducted an investigation of the Denver warehouse from August 11-15, 2014 and recommended Olson's immediate termination based on the following:

- Kris created and used fictitious stow [storage] to hide inventory loss.
- Directed his auditors to back out of Random audits to avoid metric hits from the customer.
- Shaved attendance point[s] off associates['] records to retain the associate longer.
- Stopped performing Random and Aisle audits for the last Month.
- Avoided several calls and Emails from the Whirlpool inventory group and the Loss prevention team for the last 6 weeks.
- Stopped performing and recording daily required inventory metrics that need to be signed off on and kept in a daily inventory file in the office in case of an internal or a customer audit. Last proper filing was mid-June.
- Kris has allowed this Denver location to fall from an A to a grade of F on the Top Sheet (a grading system Whirlpool uses to rate the performance metrics of a location).
- Kris left the operation for the last few weeks on an un-approved LOA.

Docket #44-3 at 11-12.

19. Olson received a letter from Penske dated August 18, 2014 stating in part, "You are currently out of work on an unapproved leave of absence, as your leave has not been approved by either of Penske's third-party vendors, FMLASource (for FMLA) or Prudential (for short term Disability)." Docket #43-4.

20. The August 18, 2014 letter further stated, "Due to the unapproved status of your leave of absence, coupled with a level of unsatisfactory job performance that cannot be tolerated, your employment with Penske is being terminated effective immediately." *Id.*

21. On August 19, 2014, FLMASource sent an email informing Penske that Olson had "contacted FMLASource today and requested that the 7/24/14 Decision letter stating that he is on

an approved FMLA Continuous Leave of Absence be resent." Docket #43-3; *see also* docket #43-10.

22.     On August 20, 2014, Penske sent Olson another letter stating, "...it has come to our attention that you applied for and have been approved for a continuous leave of absence under the Family Medical Leave Act ("FMLA") for the period of July 28, 2014, through October 19, 2014." Docket #43-5. The letter continued,

> Because the severity of your performance issues and policy violations was not discovered until after you went out on leave of absence, in a spirit of fairness, if you so desire, we will rescind your termination and continue your employment as being on unpaid leave through October 19, 2014. While this may disqualify you for eligibility for unemployment compensation benefits, it will allow you to maintain Company-provided group healthcare coverage at no cost to you through the end of October 2014.
>
> Once you have exhausted your FMLA entitlement on October 19, 2014, your employment would then be terminated. Please let us know within the next ten (10) days if you want us to rescind your termination. If we do not hear from you, the termination will stand and your Company-provided group healthcare coverage will expire on August 31, 2014.

*Id.*

23.     Olson did not choose to rescind the termination, and he was separated effective August 18, 2014. Thus, Olson was on an FMLA leave of absence when he was terminated from employment with Penske.

24.     Prior to and during Olson's FMLA leave, Elliott never discussed with Olson the performance problems for which Penske claims Olson was terminated. Elliott Depo, 40: 6 - 41: 2. In addition, Olson never received a written warning regarding such performance problems. *Id.*, 48: 8-11.

25.     Prior to Olson's termination, Elliott never showed Olson the FIT, and Olson did not have the opportunity to respond to the FIT. *Id.*, 57: 2-9.

## LEGAL STANDARDS

A motion for summary judgment serves the purpose of testing whether a trial is required. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003). The Court shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The moving party bears the initial responsibility of providing to the Court the factual basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The moving party may carry its initial burden either by producing affirmative evidence negating an essential element of the nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial." *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002). Only admissible evidence may be considered when ruling on a motion for summary judgment. *World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985).

The non-moving party has the burden of showing there are issues of material fact to be determined. *Celotex*, 477 U.S. at 322. That is, if the movant properly supports a motion for summary judgment, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing a genuine factual issue for trial. Fed. R. Civ. P. 56(e); *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("[t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.") (emphasis in original) (citation

omitted); *see also Hysten v. Burlington Northern & Santa Fe Ry.*, 296 F.3d 1177, 1180 (10th Cir. 2002). These specific facts may be shown "'by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves.'" *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 324). "[T]he content of summary judgment evidence must be generally admissible and . . . if that evidence is presented in the form of an affidavit, the Rules of Civil Procedure specifically require a certain type of admissibility, *i.e.*, the evidence must be based on personal knowledge." *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005). "The court views the record and draws all inferences in the light most favorable to the non-moving party." *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005).

The legal standard does not change because parties file cross motions for summary judgment. *See Harrison W. Corp. v. Gulf Oil Co.*, 662 F.2d 690, 692 (10th Cir. 1981) ("[T]he fact that both parties have moved for summary judgment does not permit the entry of a summary judgment if disputes remain as to material facts."). "However, cross motions for summary judgments do authorize the court to assume that there is no evidence which needs to be considered other than that which has been filed by the parties." *Id.* (cited with approval in *Kannady v. City of Kiowa*, 590 F.3d 1161, 1172 n. 9 (10th Cir. 2010)).

## **ANALYSIS**

To establish an interference claim under the FMLA, a plaintiff must demonstrate that (1) he was entitled to FMLA leave, (2) some adverse action by the employer interfered with his right to take FMLA leave, and (3) the employer's action was related to the exercise or attempted exercise of his FMLA rights. *See DeFreitas v. Horizon Inv. Mgmt. Corp.*, 577 F.3d 1151, 1159 (10th Cir.

2009). "Under this theory, a denial, interference, or restraint of FMLA rights is a violation regardless of the employer's intent." *Id.* (internal quotations and citation omitted).

"[T]he employer bears the burden of proof on the third element of an interference claim once the plaintiff has shown her FMLA leave was interfered with." *Campbell v. Gambro Healthcare, Inc.*, 478 F.3d 1282, 1287 (10th Cir. 2007). An employer can defend an FMLA interference claim "by showing that the dismissal would have occurred regardless of the employee's request for or taking of FMLA leave." *DeFreitas*, 577 F.3d at 1159-60 (internal quotations and citation omitted). That is, an employer seeking summary judgment on an interference claim must show that termination would certainly have occurred regardless of leave. *Janczak v. Tulsa Winch, Inc.*, -- F. App'x --, 2015 WL 4569681, at *4 (10th Cir. July 30, 2015) (citing *DeFreitas*, 577 F.3d at 1160). Summary judgment against an employee who was fired while validly taking FMLA leave is proper only where undisputed evidence demonstrates that the employee in question would have been terminated even if FMLA leave had not been taken. *Id.* (citing cases); *see also Brown v. ScriptPro, LLC*, 700 F.3d 1222, 1227 (10th Cir. 2012) ("summary judgment for the employer is warranted only when there is no genuine dispute as to any material fact regarding the grounds for termination").

Here, Olson seeks an order finding that Penske interfered with his FMLA rights by terminating him during his approved leave of absence. It is undisputed that Olson was fired during his FMLA leave and "[t]his may be enough to prove the third element of an interference claim, especially because the employer's intent is irrelevant."[4] *Brown*, 700 F.3d at 1227. But, Penske is correct that no FMLA violation occurs if it can prove Penske would have terminated Olson without

---

[4]Penske does not challenge whether Olson meets the first two elements necessary to prove an FMLA interference claim; accordingly, the Court will focus its analysis on the third element.

regard to his taking FMLA leave.[5] Penske contends that Olson's performance issues demonstrate as a matter of law that it would have fired Olson regardless of his FMLA leave. However, the Tenth Circuit "allowed an FMLA claim to go to a jury, even though substantial evidence existed supporting the assertion that the employee was fired for reasons unrelated to the leave, in a case where the employee had been a strong performer and the employer's proffered evidence contained internal inconsistencies." *Janczak*, 2015 WL 4569681 at *4 (citing *DeFreitas*, 577 F.3d at 1160-61). "The question here is not whether a reasonable jury could find in favor of [the employer], but rather whether the evidence is so one-sided that submission to a jury is not required." *Brown*, 700 F.3d at 1227.

In this case, Penske's stated reason for Olson's termination is his poor performance based on two warehouse audits conducted in July and August 2014 revealing "problems related to inventory, training, regular audits, and records falsification." Motion, docket #44 at 1. Citing unpublished Tenth Circuit cases, Penske contends that the Court must consider here whether Penske "honestly believed" its reason and acted in good faith on that belief. Motion, docket #44 at 12-13.

---

[5]Olson contends that Penske's August 18, 2014 termination letter proves that his termination was related to his taking the FMLA leave in that Penske asserted Olson's unapproved absence "coupled with" his performance issues were the reasons for termination. Penske counters that its "decision makers sincerely but mistakenly believed that Olson was on an unapproved leave of absence" when they decided to terminate Olson. However, the Court finds this issue immaterial; the evidence demonstrates that when the decision makers realized Olson was actually on an approved FMLA leave, they determined still to terminate him based on poor performance. Olson argues that Penske had knowledge he was on an approved leave before August 18, but Elliott testified that his only knowledge of the leave came from Olson *before* Olson was actually notified the leave was approved, and the FMLASource letter, while reflecting a notation, "Attn: Penske Truck Leasing" on the first page, was addressed only to Olson and does not reference any copies sent to Penske. Olson offers no other evidence demonstrating that FMLASource sent the letter to Penske in July 2014. Accordingly, because it is undisputed that Olson was terminated while on approved FMLA leave, the Court will proceed to analyze whether Olson's performance issues demonstrate as a matter of law that Penske would have fired Olson regardless of his FMLA leave.

However, based on prevailing law concerning FMLA *interference* claims, the Court disagrees. In *Rowe v. United Airlines*, 608 F. App'x 596, 600 (10th Cir. 2015), a case in which the plaintiff alleged claims of discrimination, retaliation and interference in violation of the FMLA and the Americans with Disabilities Act ("ADA"), the court referred generally to employment *discrimination* cases and discussed analyzing "pretext" when referring to an employer's "honest beliefs"; moreover, the case it cited for this proposition, *Rivera v. City & Cnty. of Denver*, 365 F.3d 912 (10th Cir. 2004), involved *discrimination* claims pursuant to Title VII and the Age Discrimination in Employment Act. Likewise, the other case Penske cites, *Wright v. City of Topeka*, 547 F. App'x 861, 864 (10th Cir. 2013), involved a discussion of pretext regarding the plaintiff's Title VII *discrimination* and FMLA *retaliation* claims. As set forth above, an employer's intent is irrelevant when analyzing an FMLA interference claim (*Brown*, 700 F.3d at 1227); accordingly, the Court will focus only on "whether [Penske] has come forward with evidence suggesting it would have terminated [Olson] regardless of his FMLA activities." *Id.* at 1228.

It is undisputed that Olson, as Operations Manager, was responsible for enforcing certain Penske policies and ensuring the Aurora RDC was meeting the requirements of Penske's customer, Whirlpool. Penske asserts that in July 2014, Elliott learned the Aurora RDC received a "D" grade from Whirlpool and retained Brurs, a Penske Senior Operations Supervisor from California, to assess the Aurora RDC; she "conducted aisle audits, analyzed reports, assessed the status of the customization and ding-and-dent departments, analyzed parts orders and repair work" and reported to Elliott, "We will have an inventory loss here but I honestly cannot say or even lean to [sic] how much I think it will be. There are too many holes in the inventory." She also explained: "There looks to be a lack of processes and training. Everyone relied on Kris [Olson] for everything." On August

5, 2014, as a result of the assessment, Penske wrote off $41,888 in inventory losses.

In addition, Penske's Loss Prevention department for Denver Operations conducted an investigation of the Aurora RDC from August 11-15, 2014 and recommended Olson's immediate termination based on the following:

- Kris created and used fictitious stow [storage] to hide inventory loss.
- Directed his auditors to back out of Random audits to avoid metric hits from the customer.
- Shaved attendance point[s] off associates['] records to retain the associate longer.
- Stopped performing Random and Aisle audits for the last Month.
- Avoided several calls and Emails from the Whirlpool inventory group and the Loss prevention team for the last 6 weeks.
- Stopped performing and recording daily required inventory metrics that need to be signed off on and kept in a daily inventory file in the office in case of an internal or a customer audit. Last proper filing was mid-June.
- Kris has allowed this Denver location to fall from an A to a grade of F on the Top Sheet (a grading system Whirlpool uses to rate the performance metrics of a location).

Docket #44-3 at 11-12. During his deposition in this case, Olson confirmed that he was responsible for ensuring (1) all stows were properly identified and no "ghost" or fictitious stows were used (Olson Depo, 56: 5-11); (2) the correct process was used when doing a random audit and, if he knew a re-audit was necessary, ensuring it was performed (*id.*, 55: 3 - 56:4); (3) his team performed several aisle audits per day (*id.*, 52: 5-8); (4) the inventory team kept a daily log of all inventory transactions and "signed off on" the log (*id.*, 52: 14-22); and (5) the warehouse employees' attendance records were kept accurately and the attendance policies followed (*id.*, 50: 22 - 51: 6). Accordingly, Penske has provided substantial evidence from non-decisionmakers demonstrating Olson was not meeting the duties and responsibilities of his job.

In an attempt to demonstrate disputed facts concerning Penske's reason for termination, Olson counters that Penske utilized a progressive disciplinary policy in terminating its employees,

but did not do so when terminating Olson. Olson also contends that Elliott instructed him to "reduce cycle counts or skip them" during the month for which he was accused of improper inventory practices. Moreover, Olson argues that he supervised an "inventory person" who was missing for a few days, then quit the same day he left the warehouse on leave. Finally, Olson asserts that Elliott was told (and believed) Olson did not intend to return to work after his leave, which was inaccurate, and that Elliott wanted to replace Olson as soon as possible so he could stop traveling to Denver to fill in for Olson.

First, Elliott testified that Penske was a " progressive discipline company"; he described the policy generally as management responding to an employee's policy infraction with a verbal warning, then to a subsequent infraction with a written warning, and to another infraction with suspension and/or termination. Elliott Depo: 45: 1; 46: 5 - 47:17. Elliott also testified that an employee may be terminated immediately for a "gross infraction." 47: 21-24. Here, it is undisputed that Olson received no verbal or written warnings regarding the performance issues for which he was terminated. However, Olson also provides nothing demonstrating that his alleged performance – including hiding inventory losses and altering attendance records – did not constitute gross infractions warranting immediate termination. The mere fact that progressive discipline was not used here is insufficient to raise a genuine issue of material fact.

Next, Olson points to a June 11, 2014 email response in which Elliott suggested locations from which Olson might obtain extra lift operators and instructed Olson, "Pull Andrew and Tom in and start thinking of what else you can do. Maybe you skip cycle counts or reduce them. Start thinking through this. ... Once you guys have had a chance to think this through call me in the morning and advise." Docket #43-6. Olson contends that Elliott's suggestion, "maybe you skip

14

cycle counts or reduce them," was an instruction that led to Olson's poor performance finding and eventual termination. But, the plain language of the email demonstrates Elliott's suggestion is simply that – a suggestion that Olson consider certain actions to fix his lack of personnel problem. Even if the suggestion were an instruction, however, Olson does not explain the meaning of "cycle counts" and how such term relates to the stated performance problems; his only reference to the term, "cycle counts," is the statement, "Actions were taken per Mr. Elliot's [sic] direction to meet customer requirements for quarter end shipping goals." Declaration of Kris Olson, undated, docket #45-1. Olson provides no other explanation. Without more, this fact does not raise a genuine issue concerning whether Olson's termination would not have occurred absent the FMLA leave.

As for Olson's contention that he supervised an inventory person who "had been missing from work" prior to his leave, which the Court construes as an implication that the alleged performance issues may have been caused by the absence of such person, the Court finds such implication vague and unsupported by any explanation or evidence. In fact, the evidence demonstrates that the inventory person had been missing from work "two or three days" before Olson went on leave, then quit the same day Olson left, which was July 18, 2014; however, the report prompting Elliott to bring in Brurs to investigate Whirlpool's "D" grade referred to the month of June 2014. Moreover, Olson testified that he was responsible for ensuring the Aurora RDC's inventory practices were performed to meet Whirlpool's goals. Thus, the Court perceives no genuine issue of material fact here.

Finally, Olson argues Elliott believed rumors that Olson did not intend to return to work and asserts that Elliott did not want to travel to Denver on a weekly basis to fill in for Olson while he was gone. Olson points to Elliott's deposition testimony, which the Court finds does not support

15

his argument:

Q. When Kris Olson told you that he was going out on FMLA, what did that mean to you?

A. Well, it would mean he was -- to me it meant that he was leaving the location. That he was going out on a temporary, more or less of -- kind of like a leave of absence, is kind of how I looked at it.

Q. Did you believe that he was coming back?

A. I -- at the time, yes, ma'am, I did.

At some time later I had a couple of different people tell me that they did not think he would return to work. But that was -- that was maybe two, three weeks, four weeks, a month. You know, six weeks. I don't know. At some later point.

But I believed he was -- he was coming back, yes, ma'am.

Q. Did you know when he was coming back?

A. If I remember we talked about -- here's about the number of weeks and -- and I don't remember exactly what it was, but I think his return would have been, like, sometime in either September or October.

Elliott Depo, 51: 4-23. Later in the deposition, Elliott explained that his reference to the term, "if ever," in an August 1, 2014 email to Perry in HR came from the information he received from employees who believed Olson did not intend to return. *Id.*, 74: 21 - 75: 20. Elliott qualified that he did not engage in "any detailed discussion with them regarding Kris Olson." *Id.* Nevertheless, whether Elliott believed Olson was returning to work is immaterial; the fact was not proffered as a reason for termination after Penske conceded that Olson was on approved leave.

Furthermore, Olson's contention that Elliott "did not want [the travel] schedule and wanted Olson replaced as soon as possible" is purely speculative and not supported by the cited testimony:

Q. Why did -- why did you think you could not replace Kris when he was out on leave?

> A. Just my limited understanding of FMLA, that you -- you can't take any actions, is kind of how I understood it.
>
> Q. Okay. And who did you bring in as the ops manager temp?
>
> A. I actually continued to go to that location weekly. I would make trips and stay for a couple of weeks, and then go home for the weekend, and then fly back the following week until I hired a re -- a [sic] actual replacement.
>
> Q. So did you -- when you actually hired the replacement, was that after you terminated Kris Olson?
>
> A. Yes, ma'am.
>
> Q. Okay. Did you continue to go out to that location until Kris Olson was terminated?
>
> A. Yes, ma'am. Yes.

Elliott Depo, 74:1-16. Nothing in this testimony indicates that Elliott had negative beliefs or feelings concerning his need to travel from his location in Washington to the Aurora RDC while Olson was on leave. Elliott's testimony on these issues does not raise a genuine issue of material fact as to Penske's grounds for termination.

Importantly, while Olson asserts that he was never given the opportunity before his termination to respond to the allegations of poor performance found by Penske, he provided no response, argument, or evidence here as to the validity of the particular performance issues raised. Thus, Penske's factual allegations as to Olson's performance problems stand undisputed. By any objective standard, the alleged performance deficiencies are sufficient to support a termination for cause.

The Court concludes Olson, through his motion for summary judgment, has failed to demonstrate that no genuine issues of material fact exist as to whether his termination was related to his FMLA leave, but Penske, through its motion for summary judgment, has succeeded in

demonstrating the existence of no factual issues concerning its reasons for terminating Olson. Summary judgment is proper to dismiss Olson's FMLA interference claim, because the undisputed evidence demonstrates that Penske would have terminated Olson even if Olson had not taken FMLA leave.

Penske also seeks summary judgment as to "Olson's FMLA retaliation claim" despite acknowledging that "Olson does not actually bring an FMLA retaliation claim." The Court agrees with this acknowledgment. Although Olson titles his sole claim for relief, "Family Medical Leave Act Retaliation," in the operative pleading, he alleges "Defendant interfered with Olson's right to FMLA." First Amended Complaint, ¶ 13, docket #21. Further, in both his present motion *and* his response to Penske's motion, Olson acknowledges the two theories of relief under the FMLA – discrimination/retaliation and interference – but he argues only for judgment on an interference theory and mentions nothing about allegedly suffering discrimination or retaliation. *See* Response, docket #45 at 13 ("Because the issue in an interference claim is the right to entitlement, the employee is due the benefit if the statutory requirements are satisfied, regardless of the intent of the employer."); *see also* Motion, docket #43 at 11 (same). In fact, Olson did not proffer any response to Penske's argument concerning a possible retaliation claim. *See* dockets ## 44, at 17-18; 45. Consequently, the Court reasonably construes the operative pleading as alleging only an FMLA interference claim in this case.

## CONCLUSION

For the foregoing reasons and based on the record herein, the Plaintiff's Motion for Summary Judgment as to Liability [filed July 23, 2015; docket #43] is **denied** and the Defendant's Motion for Summary Judgment [filed July 31, 2015; docket #44] is **granted** as to Plaintiff's interference claim,

but **denied as moot** as to any retaliation claim. Summary judgment will enter in favor of Penske and against Olson in this case. Olson's FMLA claim is dismissed with prejudice. Penske is awarded its costs, to be taxed by the Clerk of the Court pursuant to Fed. R. Civ. P. 54(d)(1) and D.C. Colo. LCivR 54.1.

Entered and dated at Denver, Colorado, this 18th day of September, 2015.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge